UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| VERNA BOURASSA, Guardian of Tahlen Aaron Bourassa | **4:20-CV-4210-LLP** |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| UNITED STATES OF AMERICA, ROBERT NEUENFELDT, individually and UNKNOWN SUPERVISORY PERSONNEL OF THE UNITED STATES, individually, | |
| Defendants. | |

Pending before the Court is a Motion to Dismiss (Doc. 38) and a Motion for Summary Judgment (Doc. 35) filed by Defendant United States of America.  For the following reasons, the Motion to Dismiss is denied and the Motion for Summary Judgment is granted.

## BACKGROUND

### A.    Facts

#### 1.  Flandreau Santee Sioux Tribe's 638 Contract for Law Enforcement Services

The Flandreau Santee Sioux Tribe ("the Tribe") and the United States, acting through the Bureau of Indian Affairs, Office of Justice Services ("BIA") entered into a contract wherein the Flandreau Santee Sioux Tribal Police Department was operated by the Tribe pursuant to an Indian Self-Determination and Education Assistance Act ("ISDEAA") Contract ("638 contract").  (Docs. 37, ¶ 1; 58, ¶ 1).  In this section 638 contract, the provision of law enforcement services for the Flandreau Santee Sioux Indian Reservation was transferred from the BIA to the Tribe from October 1, 2015, through September 30, 2018.  (Docs. 37, ¶ 2; 58, ¶ 2).

#### 2.  Mutual Aid Agreement and Dispatch Agreement

During this same time, the Moody County Sheriff's Office ("Moody County") and the Tribe entered into a Law Enforcement Assist Agreement in September of 2015.  (Docs. 37, ¶ 5; 58, ¶ 5).  Pursuant to the Mutual Aid Agreement, Moody County, or the Tribe could request

1

assistance from the other entity "[i]n the event of or the threat of an emergency, disaster, or widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis." (Docs. 37, ¶ 7; 58, ¶ 7). A "proper request" from Moody County to the Tribe "shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribe's Chief of Police or the Chief's designee." (Docs. 37, ¶ 8; 58, ¶ 8). While the furnishing party is rendering aid to the other, the responding officer "shall temporarily have the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered." (Docs. 37, ¶ 9; 58, ¶ 9).

As of June 17, 2017, Moody County provided dispatch services to the Tribe and the City of Flandreau. (Docs. 37, ¶ 10; 58, ¶ 10). During this timeframe, Moody County, the City of Flandreau, and the Tribe all utilized the same radio channel. (Docs. 37, ¶ 11; 58, ¶ 11). Other nearby agencies or jurisdictions also had access to this radio channel like adjacent Lake County and certain South Dakota Highway Patrol officers who worked in that geographical area. (Docs. 37, ¶ 12; 58, ¶ 11).

### 3. Events prior to pursuit of vehicle driven by Tahlen Bourassa on June 17, 2017

During the section 638 contract period, in January 2016, Chief Neuenfeldt was hired as a police officer by the Tribe's then-Police Chief, Nicholas Cottier. (Docs. 37, ¶ 13; 58, ¶ 13). Chief Neuenfeldt eventually became Acting Chief of Police for the Tribe and occupied that role on June 17, 2017. (Docs. 37, ¶ 16; 58, ¶ 16).

On the evening of June 17, 2017, Moody County Sheriff's Deputies Carl Brakke and Logan Baldini were on duty together in Brakke's police cruiser. (Docs. 37, ¶ 17; 58, ¶ 17). They were doing a drive-by security check of a residence located in rural Moody County at 24364 484th Avenue, Dell Rapids, South Dakota. (Docs. 37, ¶ 21; 58, ¶ 21).

At 11:50 p.m. on June 17, 2017, Deputy Brakke radioed to Moody County dispatch that he could see six to eight vehicles at the location and "looks like another house party going on." (Docs. 37, ¶ 23; 58, ¶ 23). Deputy Brakke then relayed to dispatch that as they pulled up to the residence, 15 individuals ran from the house toward the trees. (Docs. 37, ¶ 24; 58, ¶ 24). Deputy Brakke

said he believed there were more people in the house, and there were a number of people who did not run, but instead stayed in the driveway near Deputy Brakke's cruiser. (Docs 37, ¶ 25; 58, ¶ 25).

Deputy Brakke testified that he was involved with radio traffic from at least two different dispatchers and two different radio channels that night. (Docs. 37, ¶ 27; 58, ¶ 26). He testified that after he contacted Moody County's dispatch, he went to the "Brookings inter-agency" channel and asked for assistance at a house party and "gave the address the same type of way" that he gave to his own dispatcher. (Doc. 37, ¶ 28; 58, ¶ 28). Deputy Brakke testified that on his inter-agency request for assistance, he asked for "any available units" or "can you start all units to my location" and "went on to explain about the kids running and the number of vehicles." (Docs. 37, ¶ 29; 58, ¶ 29). Deputy Baldini also testified that Deputy Brakke made a call for "a general assist" on the radio. (Docs. 37, ¶ 31; 58, ¶ 31).

At 11:52 p.m., Deputy Brakke contacted Flandreau City Police Officer Brent Goehring via radio and told him about the party at the residence. (Docs. 37, ¶ 32; 58, ¶ 32). Officer Goehring responded, "10-4. We can start heading that way." (Docs. 37, ¶ 32; 58, ¶ 32).

At about 12:02 a.m. on June 18, 2017, one of the partygoers standing in the driveway with Deputies Brakke and Baldini started to have a seizure. (Docs. 37, ¶ 33; 58, ¶ 33). Deputy Brakke requested an ambulance to assist with the seizure. (Docs. 37, ¶ 34; 58, ¶ 33). At about 12:05 a.m., South Dakota Highway Patrol Trooper Isaac Kurtz was working in the area and asked Moody County dispatch if Deputy Brakke needed assistance with the house party. (Docs. 37, ¶ 36; 58, ¶ 36). Dispatch responded and said, "Yes, please." (Docs. 37, ¶ 36; 58, ¶ 36).

Sheriff Troy Wellman of Moody County testified that his Moody County employees at the rural property "obviously were outnumbered and tried to call in other resources to try to contain the situation." (Docs. 37, ¶ 39; 58, ¶ 39). Sheriff Wellman testified that Deputy Brakke made "a request for additional resource[s]," but it was not to Chief Neuenfeldt specifically. (Docs. 37, ¶ 41; 58, ¶ 41). However, Sheriff Wellman also testified that there was, in general, a radio "call for backup to all available units," and "the tribe falls into that." (Docs. 37, ¶ 42; 58, ¶ 43; 40-1, Wellman Dep. 33:22-24 ).

Chief Neuenfeldt was also on duty on June 18, 2021, and testified that he responded to the house party scene because he heard Deputy Brakke call out over the radio and request assistance "when one of the people he was with started having a seizure." (Docs. 37, ¶ 44; 58, ¶ 44). Chief Neuenfeldt arrived on the scene at 12:13 a.m. and testified he believed he arrived before the ambulance. (Docs. 37, ¶¶ 45-46; 58, ¶¶ 45-46). By the time the ambulance arrived, the seizure had passed, and the individual did not need to be transported to the hospital for medical care. (Docs. 37, ¶ 35; 58, ¶ 35). Officer Goehring arrived on the scene at 12:17 a.m. (Docs. 37, ¶ 47; 58, ¶ 47). Trooper Kurtz arrived on the scene at 12:35 a.m. (Docs. 37, ¶ 48; 58, ¶ 48).

### 4.  The pursuit of Bourassa'a vehicle

After 1:20 a.m., Deputy Brakke was in or near his police cruiser in the driveway to the residence giving tickets and processing some of the partygoers who had not fled. (Docs. 37, ¶ 49; 58, ¶ 49). Chief Neuenfeldt, Deputy Baldini, and Trooper Kurtz had helped search the area for the partygoers who had fled and cleared other structures on the rural property and were having a discussion at the end of the driveway. (Docs. 37, ¶ 50; 58, ¶ 50; 41-5, Baldini Dep.: 54:14-18). At that time, Deputy Brakke reported that he had already seen at least three cars drive north past the driveway to the residence that would stop about a half of a mile past the driveway and then speed off, as though they were picking up those partygoers who had fled. (Docs. 37, ¶ 51; 58, ¶ 51). Deputy Brakke relayed via radio to the other police units that these cars may be picking up people that ran from the house. (Docs. 37; ¶ 52; 58, ¶ 52). While talking with Deputy Baldini and Chief Neuenfeldt, Trooper Kurtz noticed a vehicle traveling eastbound on 244th Street. (Docs. 37, ¶ 53; 58, ¶ 53). Trooper Kurtz was in his cruiser and drove south toward the vehicle that he saw. (Docs. 37, ¶ 54; 58, ¶ 54).

The vehicle that was approaching the residence turned out to be a gray Dodge pickup that was driven by Tahlen Bourassa. (Docs. 37, ¶ 59; 58, ¶ 59). Micah Roemen and Morgan Ten Eyck were passengers in Bourassa's pickup. (Docs. 37, ¶ 60; 58, ¶ 60).

Bourassa turned north onto 484th Avenue and started heading towards the residence. (Docs. 37, ¶ 61; 58, ¶ 61). After Bourassa's vehicle passed Trooper Kurtz, Trooper Kurtz turned around to go north on 484th Avenue and activated his emergency lights to stop Bourassa's truck. (Docs. 37, ¶¶ 62-63; 58, ¶ 62-63).

4

Bourassa approached the driveway to the residence in his vehicle. (Docs. 37, ¶ 64; 58, ¶ 64). Bourassa stopped at the driveway for Sergeant Kurtz's emergency lights. (Doc. 37, ¶ 68, 58, ¶ 68). During this stop, Bourassa locked his doors as Chief Neuenfeldt ran across the front of the truck and to the driver's side. (Doc. 37, ¶ 69; 58, ¶ 69; Doc. 41-8, Roemen Dep. 75-14-25). Roemen testified that Chief Neuenfeldt told Bourassa he would arrest him if Bourassa did not unlock his doors. (Doc. 37, ¶ 70; 58, ¶ 70).

Chief Neuenfeldt reached for the door handle and pulled on the handle two or three times to try and open the door. (Doc. 41-8, Roemen Dep. 80:4-25). Bourassa did not unlock his doors and did not exit the vehicle. (Doc. 37, ¶ 71; 58, ¶ 71). The last time Chief Neuenfeldt pulled on the door handle, Bourassa accelerated and fled. (Doc. 41-8, Roemen Dep. 80:4-25). Chief Neuenfeldt drew his gun as the Bourassa vehicle accelerated. (Docs. 37, ¶ 72; 58, ¶ 72).

Chief Neuenfeldt testified that he was struck in the left thigh and shoulder by Bourassa's truck and knocked to his knees as it drove by at approximately 20 m.p.h.; that Bourassa "sideswiped [him] when he went past." (Docs. 37, ¶ 73; 58, ¶ 73; 41-2, Neuenfeldt Dep. 254:13-21). There is no known witness to the strike. (Docs. 37, ¶¶ 74-75; 58, ¶¶ 74-75). Roemen did not see the strike, but admitted he could not see Chief Neuenfeldt's lower body at all through the driver-side window. (Docs. 37, ¶ 74; 58, ¶ 74). Deputies Baldini and Brakke did not witness the truck striking Chief Neuenfeldt, but they testified they saw Chief Neuenfeldt getting up from his knees as Bourassa's truck sped away. (Docs. 37, ¶ 75; 58, ¶ 75). Later that evening after the incident concluded, Chief Neuenfeldt sought medical care at the emergency room, where the provider noted objective findings of "a little bit of bruising" on his left lower thigh that looked like it would turn into a "more significant bruise as time goes." (Docs. 37, ¶ 76; 58, ¶ 76). The provider also observed that his left shoulder did not appear bruised, but it was "a little bit red." (Docs. 37, ¶ 77; 58, ¶ 77).

Trooper Kurtz was behind Bourassa's truck as it sped away, and Trooper Kurtz immediately initiated a high-speed pursuit going north on 484th Avenue around 1:21 a.m. (Docs. 37, ¶ 78; 58, ¶ 78). Trooper Kurtz listed the reason for initiating the pursuit as exhibition driving and failure to stop when directed by law enforcement. (Docs. 37, ¶ 79; 58, ¶ 79).

Once Trooper Kurtz initiated the pursuit, he asked dispatch to contact a supervisor. (Doc. 37, ¶ 82; 58, ¶ 82). Chief Neuenfeldt got in the driver's side of his cruiser and Deputy Baldini ran

to Chief Neuenfeldt's cruiser and got in the passenger's side.  (Docs. 37, ¶¶ 83-84; 58, ¶¶ 83-84).
Chief Neuenfeldt's cruiser was secondary behind Trooper Kurtz in the pursuit.  (Docs. 37, ¶ 85;
58, ¶ 85).  At approximately 1:22 a.m., Chief Neuenfeldt relayed over the radio: "HP28: He hit me
with his truck.  That's assault on law enforcement."  (Docs. 37, ¶ 87; 58, ¶ 87).

From 484th Avenue, Bourassa turned west onto 242nd Street, and Trooper Kurtz followed
Bourassa.  (Docs. 37, ¶ 88; 58, ¶ 88).  At this time, Highway Patrol Trooper Chris Spielmann
entered the area after hearing the pursuit on radio traffic.  Trooper Spielmann set up across 481st
Avenue just north of 241st Street, ahead of Bourassa to prepare spike strips.  (Docs. 37, ¶ 89; 58, ¶
85; Doc. 41-8, Roemen Dep. 94:1-22).  Trooper Kurtz gave Trooper Spielmann permission to
deploy spikes.  (Docs. 37, ¶ 94; 58, ¶ 94).  Bourassa then turned northbound on 481st Avenue and
approached the position of Trooper Spielman.  (Docs. 37, ¶ 95; 58, ¶ 95).  Bourassa avoided the
spikes by driving in the ditch and turning east on 241st Street.  (Docs. 37, 96; 58, ¶ 96).  Roemen
testified that Bourassa was driving 100 miles per hour at times throughout the pursuit.  (Doc. 41-
8, Roemen Dep. at 95:11-13).  Trooper Kurtz also turned east on 241st Street.  (Doc. 37, ¶ 97; 58,
¶ 97; 41-8, Roemen Dep. at 94:6-25).

After traveling east on 241st Street for approximately 3 miles, Bourassa turned south onto
484th Avenue and then quickly turned east on 242nd Street.  (Docs. 37, ¶ 98; 58, ¶ 98).  Roemen
testified that after turning east on 242nd Street, Bourassa stopped in the middle of the road and
turned off his headlights.  (Docs. 37, ¶ 99; 58, ¶ 99).

Meanwhile, Trooper Kurtz shadowed Bourassa by turning southbound on 484th Avenue.
(Docs. 37, ¶ 101; 58, ¶ 101).  Trooper Kurtz temporarily lost sight of the Bourassa vehicle near the
intersection of 484th Avenue and 242nd Street.  (Docs. 37, ¶ 102; 58, ¶ 102).  Shortly after he lost
sight of the Bourassa vehicle, Trooper Kurtz saw Bourassa's taillights headed eastbound, and he
relayed that location to the other pursuing police units.  (Docs. 37, ¶ 103; 58, ¶ 103).

While the Bourassa truck was hiding, Roemen watched other "cop" cars "fly by"
continuing south on 484th Avenue, but one police car turned east on 242nd Street and started driving
toward Bourassa's truck.  (Docs. 37, ¶ 104; 58, ¶ 104).  Chief Neuenfeldt and Deputy Baldini were
the closest law enforcement vehicle to Bourassa's last known whereabouts, as they were traveling
southbound on 484th Avenue between 241st Street and 242nd Street when they heard Trooper Kurtz

relay that he believed he saw Bourassa's taillights eastbound on 242nd Street, so they turned east on 242nd Street, saw Bourassa's taillights, and Bourassa fled again. (Docs. 37, ¶ 105; 58, ¶ 105).

Chief Neuenfeldt and Deputy Baldini saw Bourassa's vehicle within minutes after Trooper Kurtz lost sight, and they continued the pursuit as the primary pursuer. (Docs. 37, ¶ 106; 58, ¶ 106). At around 1:30 a.m., a couple of minutes after Trooper Kurtz lost sight of the Bourassa, he radioed that he would try to get ahead of the Bourassa truck to block him. (Docs. 37, ¶¶ 107-08; 58, ¶¶ 107-08).

From eastbound on 242nd Street, Bourassa turned north on 485th Avenue, with Chief Neuenfeldt and Deputy Baldini following directly behind. (Docs. 37, ¶ 111; 58, ¶ 111). Bourassa turned west on 237th Street and traveled that road for about a mile before turning north onto 484th Avenue. (Docs. 37, ¶ 113; 58, ¶ 113). Next, after traveling north on 484th Avenue for about a mile, Bourassa turned west onto 236th Street and drove on that road for two miles. (Docs. 37, ¶ 114; 58, ¶ 114). Bourassa then turned north on 482nd Avenue and drove north on that road for approximately 5 miles until 482nd Avenue turned into 231st Street, going west until reaching Highway 13. (Docs. 37, ¶ 115; 58, ¶ 115).

During about a mile of this portion of the pursuit, 482nd Avenue turned into a minimum maintenance road called a two track, but Chief Neuenfeldt knew this road turned back into gravel after that section, so he continued pursuit. (Doc. 37, ¶ 116; 58, ¶ 116). As the pursuit reached just southeast of the town of Flandreau, FSST Tribal Police Officer Brian Arnold was driving toward Bourassa's vehicle. (Doc. 37, ¶ 117; 58, ¶ 117). Right before Bourassa turned north onto Highway 13, Bourassa met Officer Arnold and forced Officer Arnold off the road and into the ditch. (Doc. 37, ¶ 118; 58, ¶ 118).

Bourassa sped north on Highway 13 through the town of Flandreau. (Docs. 37, ¶ 119; 58, ¶ 119). Once Bourassa crossed the bridge on Highway 13 just north of Flandreau, Bourassa went by a car and then came to a very rapid stop on Highway 13 just north of 229-A. (Docs. 37, ¶ 120; 58, ¶ 120). This was the only time the pursuit crossed paths with a non-law enforcement vehicle. (Doc. 37, ¶ 121; 58, ¶ 121). Chief Neuenfeldt stopped his cruiser in the southbound lane behind Bourassa and Deputy Baldini got out of the cruiser and told Bourassa to stop or get out of the vehicle. (Docs. 37, ¶ 122; 58, ¶ 122).

Bourassa disregarded Deputy Baldini's commands. (Docs. 37, ¶ 123; 58, ¶ 123). Instead of continuing north or south on Highway 13, Bourassa suddenly reversed and turned east down 229-A. (Docs. 37, ¶¶ 123, 125; 58, ¶¶ 123, 125; 41-5, Baldini Dep. 181:182:10-187:13). Once Deputy Baldini got back inside the cruiser, Chief Neuenfeldt and Deputy Baldini pursued Bourassa's vehicle east down 229-A which Chief Neuenfeldt knew to be a dead-end road. (Docs. 37, ¶¶ 124, 126; 58, ¶¶ 124, 126).

Chief Neuenfeldt testified that he slowly followed Bourassa east down 229-A because the road was dusty and he knew it was a dead-end. (Docs. 37, ¶ 126; 58, ¶ 126). Chief Neuenfeldt and Deputy Baldini estimated their cruiser was approximately a quarter of a mile behind Bourassa's truck on 229-A. (Docs. 37, ¶ 127; 58, ¶ 127). Chief Neuenfeldt recalls being near a specific grove of trees when Deputy Baldini got on the radio and said he thought Bourassa wrecked. (Docs. 37, ¶ 127; 58, ¶ 128). At 1 hour, 42 minutes and 59 seconds on the call log, Deputy Baldini reported that Bourassa was heading eastbound on 229-A. (Doc. 41-6). Approximately 19 seconds later, at 1 hour, 43 minutes and 18 seconds on the call log, Deputy Baldini reported that Bourassa's vehicle had wrecked. (Doc. 41-6). Approximately 58 seconds later, at 1 hour, 44 minutes and 16 seconds on the call log, Deputy Baldini reported that 3 individuals were on the ground ejected. (Doc. 41-6). Approximately 9 seconds after it was reported that 3 individuals were on the ground ejected, South Dakota Highway Patrolman Denver Kvistad arrived on the scene. (Doc. 41-6). The entire vehicle pursuit lasted nearly 24 minutes. (Doc. 41, LaRocque Decl. Exs. 4, 6).

In his accident report, Chief Neuenfeldt reported that he "began to drive into the pasture and became hung up on a large fence post the suspect vehicle had apparently knocked over." (Doc. 41-15). Deputy Baldini testified in his deposition that they had trouble stopping on 229-A and the vehicle came to a stop on the fence in the field. (Doc. 41-5, Baldini Dep., 193:10-194:10; 223:18-224:21). Deputy Baldini said the reason they could not stop was because the brakes got hot during the pursuit. (Doc. 41-5, Baldini Dep. 224:18-225:12).

Roemen testified that once Bourassa turned onto 229-A, he told Bourassa that it was a dead-end road. (Docs. 37, ¶ 133; 58, ¶ 123; Doc. 59-3, Roemen Dep. 88:9-89:23). Bourassa continued to drive fast down 229-A. (Docs. 37, ¶ 134; 58, ¶ 134; 41-8, Roemen Dep. 112:1-13). The vehicle crashed and all three occupants of the pick-up were ejected from the vehicle and

sustained serious injuries. (Docs. 37, ¶¶ 135-36; 58, ¶¶ 135-36). While Chief Neuenfeldt and Deputy Baldini were the first responders on the accident scene, Highway Patrolman Denver Kvistad, City Officer Brent Goehring, and FSST Officer Arnold all arrived within one or two minutes of the crash. (Docs. 37, ¶ 137; 58, ¶¶ 135-36).

### B.    Procedural History

On December 30, 2020, Plaintiff Verna Bourassa, guardian of Tahlen Aaron Bourassa, ("Bourassa") filed a complaint against Defendants United States of America, Robert Neuenfeldt, and Unknown Supervisory Personnel of the United States. (Doc. 1). On January 24, 2022, this Court granted Neuenfeldt's Motion to Dismiss the *Bivens* claim alleged against him on the basis that such claim was barred by the statute of limitations. (Doc. 15). On May 24, 2022, the parties filed a Joint Motion to Dismiss Count III of the complaint against Unknown Supervisory Personnel of the United States which the Court granted. (Docs. 25, 26). The sole remaining claim in this lawsuit is Count I which alleges a claim of negligence against the United States under the Federal Tort Claims Act.

The Government has moved to dismiss the FTCA claim alleged against it on the basis of sovereign immunity. Also pending before the Court is a motion for summary judgment filed by the Government on the FTCA claim. The motions have been fully briefed and the Court heard oral argument on the Motion for Summary Judgment on August 23, 2023.

## DISCUSSION

### I.    Motion to Dismiss

The Government has moved to dismiss Bourassa's negligence claim against the United States under Rule 12(b)(1) of the Federal Rules of Civil Procedure. The Government argues that Bourassa's negligence claim is barred under the discretionary function exception to the Federal Tort Claims Act ("FTCA"). The Government argues in the first instance that Neuenfeldt was acting in an area of his jurisdiction as it is defined in the BIA Law Enforcement Handbook when he was responding to a request for assistance under the Mutual Assist Agreement with Moody County. (Doc. 39 at 221). If the Court was instead to find that Neuenfeldt was acting outside of his jurisdiction under the Law Enforcement Handbook when pursuing Bourassa in Moody County, the Government argues that the language of the BIA Handbook related to pursuits "Beyond

Jurisdiction" utilizes non-mandatory language and is discretionary on its face. The Court will address each argument in turn.

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

In *Berkovitz v. United States*, 486 U.S. 531 (1988), the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies. *Id.* at 536. First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536). The requirement of judgment or choice is not satisfied if a "federal statute, regulation,[1] or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Id.* (quoting *Berkovitz*, 486 U.S. at 536). Second, the conduct must be "based on considerations of public policy." *Id.* at 322-23. The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324. The plaintiff must rebut this presumption. *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998). Otherwise, the court will "presume the decision was based on public policy considerations." *See id.*

For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in policy of the regulatory regime. *Gaubert*, 499 U.S. at 324-25. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but

---

[1] In *Gaubert v. United States*, the United States Supreme Court acknowledged that the discretionary function exemption also applies to an agency's internal guidelines." *See* 499 U.S. 315, 324 (1991) (stating that an agency may rely on internal guidelines rather than on published regulations).

on the nature of the actions taken and on whether they are susceptible to policy analysis. *Id.* at 325.

### A.    Standard of Review

The United States has moved to dismiss the claims against it as alleged in Plaintiffs' Second Amended Complaint on the basis of lack of subject matter jurisdiction. An argument that the Court lacks subject matter jurisdiction to hear a case may be raised at any time. Fed. R. Civ. P. 12(h)(1), (3).

In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the complaint must be successfully challenged on its face or on the factual truthfulness of its averments. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993). In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction. *Id.* In a factual attack on the jurisdictional allegations of the complaint, the court may receive competent evidence such as affidavits, deposition testimony, and the like in order to determine the factual dispute. *Id.*

The Government makes a factual challenge on the jurisdictional allegations of the Second Amended Complaint. (Doc. 97 at 2462). The Court may therefore consider matters outside the pleadings in resolving this jurisdictional issue without converting the motion to a motion for summary judgment. *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). When a district court engages in a factual review, it inquires into and resolves factual disputes. *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002), *overruled on other grounds as recognized by Henson v. Union Pacific R.R. Co.*, 3 F.4th 1075, 1082 (8th Cir. 2021). In resolving a factual attack, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Osborn v. United States*, 918 F.2d 724, 730 (8th Cir. 1990). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed materials facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* The party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence. *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011).

11

The Rule 12(b)(1) procedure enables the court to resolve a threshold jurisdictional issue without the need for trial, unless the issue is "so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Moss*, 895 F.3d at 1097. If the jurisdictional issue is "bound up" with the merits it remains within the district court's discretion to decide whether to evaluate the evidence under the summary judgment standard. *Id.*

**B.     Is the BIA Law Enforcement Handbook Discretionary on the whole?**

The Government argues that the BIA Law Enforcement Handbook as a whole is discretionary, not mandatory. It cites to the following provision of the Handbook in support of its argument:

> The Law Enforcement Handbook is designed to guide all law enforcement officers and employees engaged in law enforcement. It provides general policies, rules, and procedures and serves as an outline for law enforcement officers and employees of the Bureau of Indian Affairs, Office of Justice Services. It is important to understand that policies, rules, and procedures cannot be arbitrarily established to cover all situations that arise in law enforcement. Some decisions must be left to the intelligence, experience, initiative, training, and judgment of the individual officers and employees.

(Doc. 39 at 225) (citing Hogden Decl., Ex. 11 at 14). The Government has not cited to any decisions by other courts that have held that the BIA Law Enforcement Handbook is discretionary on the whole and the Court had been unable to find any such cases in its independent research. Most courts have examined particular policies and provisions within the BIA Law Enforcement Handbook in their analysis of the discretionary function exception and this Court will do the same. *See, e.g., Four v. U.S. ex rel. Bureau of Indian Affairs*, 431 F.Supp.2d 985, 990 (D.N.D. 2006) (examining the emergency calls policies within the Law Enforcement Handbook); *Gooden v. U.S. Dept. of Interior*, 339 F.Supp.2d 1072, 1078-79 (D.N.D. 2004) (examining use-of-training, pre-service and in-service training of BIA officers in the Law Enforcement Handbook); *Miller v. United States*, 992 F.3d 878, 887 (9th Cir. 2021) (examining disciplinary policy in Law Enforcement Handbook).

**C.     Are the pursuit policies in the BIA Law Enforcement Handbook Discretionary?**

The Government argues that specific pursuit provisions of the BIA Law Enforcement Handbook that are at issue in this case are discretionary. Two courts in the district of South Dakota

have concluded that certain pursuit policies in the BIA Law Enforcement Handbook are discretionary. *See Colombe v. United States*, Civ. No. 5:16-5094, 2019 WL 7629237, at *14-17 (D.S.D. Jul. 30, 2019), *report and recommendation adopted by* 2019 WL 7628982 (D.S.D. Oct. 21, 2019) (Viken, J.); *see also Uses Many v. United States*, Civ. No. 3:15-3004, 2017 WL 2937596, at *5 (D.S.D. Jul. 7, 2017) (Lange, J.). In *Colombe,* the Honorable Veronica Duffy found that although some portions of the BIA Handbook's pursuit policy are phrased in mandatory terms, considering the policy as a whole, "the ultimate decisions of whether to initiate and whether to continue a pursuit are left to the sound discretion of the officers." *Colombe*, 2019 WL 7629237, at *14; *see also Uses Many*, 2017 WL 2937596, at *5. The court found in *Colombe*, "[t]his intent is particularly manifested in the sections of the policy which directly address authorization for pursuit (2-24-03); factors to consider before engaging in and while continuing a pursuit (2-24-04) and guidelines for pursuits (2-24-06). *Id.*

> In the section (2-24-03) which addresses authorization for pursuit, paragraph A instructs that officers should "use the same objective reasonableness standard he/she uses when any force is used in the course of accomplishing their duties." That language certainly implicates use of discretion by officers.
>
> In the section (2-24-04) which addresses the factors to consider before engaging in and while continuing a pursuit, the policy lists several factors which should be considered, but stresses the list is not comprehensive (i.e. "[t]hese considerations include, but are not limited to . . ."). In other words, the officers are expected to use their discretion in deciding what to consider when determining the risk/benefit analysis of proceeding with or continuing the pursuit.
>
> And in the section which lists the general guidelines for pursuits (2-24-06), the policy begins in paragraph A by acknowledging that "[n]o set of guidelines can address all possible circumstances. As a result, officers are expected to evaluate their actions based on whether the potential benefits of their actions outweigh the risks that are involved." Again by acknowledging the guidelines are not comprehensive, the policy clearly indicates the officers are expected to use their discretion.

*Id.* These courts further found that pursuit conduct challenged in those cases was the kind that the discretionary function was design to shield. *Colombe*, 2019 WL 7629237, at *15-16; *Uses Many*, 2017 WL 2937596, at *5 ("This Court has been presented with no reason to treat Officer Long Mandan's decision to initiate and continue the pursuit any differently than an officer's decision of the manner to effectuate an arrest, both falling with the type of judgments shielded by the discretionary function exception."). In *Colombe*, Judge Duffy stated that decisions "pertaining

whether to initiate and/or whether to continue a vehicle pursuit are directly related to policy analysis and considerations of public policy" and that "[s]uch decisions clearly implicate 'competing and legitimate concerns of public safety and require determinations about priorities of serious threats to public health and the allocation of limited law enforcement resources.'" *Id.* at *17 (quoting *Fitzsimmons v. United States*, 496 F.Supp.2d 1035, 1044 (D.N.D. 2007)).

It does not appear that Plaintiff contests that under the BIA pursuit policy, the decisions of officers to initiate or continue pursuit are discretionary decisions *if* an officer is acting within his jurisdictional authority. However, it is undisputed that in this case, Chief Neuenfeldt's conduct occurred entirely outside the reservation. Pursuant to the Annual Funding Agreement, which is incorporated by reference into the Tribe's section 638 contract, the Tribe is authorized to provide law enforcement services to "all persons visiting or residing within the exterior boundaries of the Flandreau Santee Sioux Tribal Reservation." (Docs. 40-1 at 259-60). The Annual Funding Agreement acknowledges, however, that "[w]hen operating within the scope of this contract, the [Tribe] may be required to leave or operate outside of Indian country." (Docs. 40-1 at 260; 37, ¶ 4). The Funding Agreement lists instances in which the Tribe may be required under the section 638 contract to operate outside the boundaries of the reservation, but specifies that the list is not exclusive. (Docs. 40-1 at 260; 37, ¶ 4) ("Such requirements may include, but are not limited to. . ."). In this case, the Government acknowledges that the Tribe was operating under its section 638 contract when providing law enforcement services pursuant to the Assist Agreement with Moody County.

The Assist Agreement provides that "[i]n the event of or the threat of an emergency, disaster, or widespread conflagration which cannot be met with the facilities of one of the parties to this agreement, the other party agrees, upon proper request, to furnish law enforcement assistance to the party requesting the assistance upon either an actual or standby basis." (Doc. 37, 7). "A proper request for the County shall only be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribal Chief of Police or the Chief's designee." (Doc. 37, ¶ 8). Although the Assist Agreement provides that "any law enforcement officer rendering the assistance shall temporarily have the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered," that does not mean that the Tribe no longer has to follow mandatory standards set forth

in the Law Enforcement Handbook when acting pursuant to the Assist Agreement. (Doc. 37, ¶ 9). The Annual Funding Agreement is clear that mandatory standards in the Law Enforcement Handbook govern the Tribe's conduct whenever it is operating under its section 638 contract. (Doc. 40-1 at 260).

This case differs from *Colombe* and *Uses Many* is several respects. In *Colombe* and *Uses Many*, the tribal police officers, instead of state troopers, initiated and continued the pursuit within reservation boundaries. *Colombe*, 2019 WL 7629237 at *2-3; *Uses Many*, 2017 WL 2937596, at *1. Neither *Colombe* nor *Uses Many* examined section 2-24-09, entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency." The issue in those cases was whether the tribal officer's conduct in initiating within reservation boundaries and continuing the pursuit within reservation boundaries was discretionary under the Law Enforcement Handbook and tribal pursuit policy. *See Colombe*, 2019 WL 7629237, at *5-6; *Uses Many*, 2017 WL 2937596, at *4. In *Uses Many*, the court found that the pursuing officer followed all of the applicable mandates of the pursuit policy. 2017 WL 2937596, at *5. At issue in this case, however, is whether Chief Neuenfeldt had discretion under the Law Enforcement Handbook to join in and then continue a pursuit initiated by another jurisdiction and which started and continued entirely outside the boundaries of the Tribe's reservation.

Section 2-24-09 of the Law Enforcement Handbook is entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency" and section(B)(3) provides that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration." (Doc. 41-11). This pursuit was initiated miles from the Flandreau Santee Sioux Indian Reservation. The pursuit was initiated by Trooper Kurtz with the South Dakota Highway Patrol. The Law Enforcement Handbook provides that under these circumstances, officers will discontinue pursuit unless officer safety becomes a consideration. The United States has argued that the fact that the policy requires an officer to evaluate officer safety renders the policy discretionary. This case is unique, however, in that the officer safety was essentially a non-issue once Trooper Kurtz was evaded by Bourassa during the pursuit. Chief Neuenfeldt did not have discretion to continue the pursuit once Trooper Kurtz lost contact with Bourassa. The policy provides that absent considerations of officer safety, an officer "will discontinue" a pursuit initiated by another jurisdiction.

**D.**   **Does section 2-24-09(B)(3) of the BIA Law Enforcement Handbook entitled "Pursuits-Beyond Jurisdiction or Initiated by Another Agency" apply in this case?**

The Government argues that Neuenfeldt was operating in an area of his jurisdiction and therefore section 2-24-09(B)(3) of the BIA Law Enforcement Handbook does not apply. (Doc. 39 at 228). The BIA Law Enforcement Handbook defines "jurisdiction" as: "[t]he sphere of authority and the territorial limits within which any particular authority may be exercised." (Doc. 39 at 228) (citing Hogden Decl., Ex. 11 at 28, Handbook page 660). The Government argues that because Neuenfeldt was on the scene pursuant to the Mutual Assist Agreement with Moody County, under the terms of the Mutual Assist Agreement, Neuenfeldt had "the same powers and authority conferred by law on the members of the law enforcement of the party to which the assistance is rendered." (Doc. 39 at 228). Accordingly, the Government argues that at all times relevant to this dispute, Neuenfeldt was operating within his "jurisdiction" as it is defined by the BIA Law Enforcement Handbook because he was operating within his "sphere of authority and the territorial limits within which any particular authority may be exercised." (Doc. 39 at 228).

Subsection (B)(3) of section 2-24-09 provides that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration." It is important to note that the term "jurisdiction" is used twice in subsection (B)(3). If the Court were to apply the Law Enforcement Handbook definition of "jurisdiction" to construe the meaning of these terms as the Government urges the Court to do, subsection (B)(3) would provide that "officers will discontinue pursuits initiated by another 'sphere of authority and territorial limits within which any particular authority may be exercised' when the pursuit continues outside their 'sphere of authority and territorial limits within any particular authority may be exercised,' unless officer safety becomes a consideration." This construction not only yields a nonsensical statement and result, it is inconsistent with the reading of section 2-24-09 as a whole.

The entirety of section 2-24-09 of the Law Enforcement Handbook is as follows:

2-24-09     PURSUITS-BEYOND JURISDICTION OR INITIATED BY ANOTHER AGENCY

    A. A pursuit may extend beyond the reservation line, but primary control of the pursuit must be relinquished as soon as practical to police

16

personnel of the entered jurisdiction if their policy allows them to enter the pursuit.

B. The following guidelines govern joining a pursuit initiated by another jurisdiction:
   1. Officers must follow LE Handbook Section 2-24-02, Authorization for Pursuit.
   2. An officer may participate in a pursuit initiated by another jurisdiction to assist with officer safety concerns but should request that the pursuit be terminated if conditions pose a safety hazard.
   3. OJS officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration.

C. Regardless of the location of the pursuit, or the lead agency, officers will act consistent with the procedures and guidelines, established in this directive.

D. When accompanied by civilian passengers, officers may not engage in a pursuit. If a civilian is in the police vehicle at the beginning of a pursuit, the officer will turn the pursuit over to another officer, or leave the civilian at a safe location.

The title of section 2-24-09 provides that the section covers: (1) pursuits beyond jurisdiction, and (2) pursuits initiated by another agency. Subsection (A) discusses pursuits beyond jurisdiction which is described therein as "a pursuit . . . beyond the reservation line." Subsection (B) discusses pursuits initiated by another agency. Subsection (C) says "regardless of the location of the pursuit, or the lead agency, officers shall act consistent with the procedures and guidelines established in this directive."

Subsection (B)(3) of section 2-24-09 provides that "officers will discontinue pursuits initiated by another jurisdiction when the pursuit continues outside their jurisdiction, unless officer safety becomes a consideration." Construing these terms in light of section 2-24-09 as a whole leads the Court to conclude that in the first instance, the term "jurisdiction" refers to "another agency" and in the second instance, the term "jurisdiction" refers to territory "beyond the reservation line." It is undisputed that the pursuit at issue in this case was "initiated by another agency"—the South Dakota Highway Patrol—and "continued outside [Neuenfeldt's] jurisdiction"—i.e. "beyond the reservation line." Accordingly, the Court concludes that section 2-24-09(B)(3) applies under the facts of this case and that Officer Neuenfeldt's conduct is not barred by the discretionary function exception to the FTCA.

17

## II.     Motion for Summary Judgment

The Government argues that Bourassa's negligence claim is barred under the rule of contributory negligence and under assumption of the risk. (Doc. 36 at 179, 182). The Government also argues that due to the private person analog to the FTCA, state law immunity under SDCL § 3-21-9 bars Plaintiff's claim. (Doc. 36 at 183).

### A. Contributory negligence

Contributory negligence is a "breach of duty which the law imposes upon persons to protect themselves from injury, and which, concurring and cooperating with actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause." *Johnson v. Armfield*, 672 N.W.2d 478, 481 (S.D. 2003) (citing *Boomsma v. Dakota, Minnesota, & E. R.R. Corp.*, 651 N.W.2d 238, 245-46 (S.D. 2002)). Where plaintiff's contributory negligence is more than slight compared to defendant's negligence, plaintiff is barred from recovery provided it is a proximate cause of the injury. *Id.* (citing SDCL § 20-9-2).

"Slight" with regard to negligence has been defined by the South Dakota Supreme Court to be "small in amount or of little importance or insignificant or unsubstantial or inconsiderable, that is to say, it was not slight in comparison with the negligence of the defendant." *Nugent v. Quam*, 152 N.W.2d 371, 380 (S.D. 1967); *c.f. Wood v. City of Crooks*, 559 N.W.2d 558, 560-61 (S.D. 1997) (holding as a matter of law that a jury's finding of 30% contributory negligence is more than slight). Whether a plaintiff was contributorily negligent is a question of fact properly submitted to the factfinder. *Theunissen v. Brisky*, 438 N.W.2d 221, 223-24 (S.D. 1989). "It is only when the facts show beyond any dispute that plaintiff has committed negligence more than 'slight,' that it is appropriate for [a court] to hold, as a matter of law, for a negligent defendant." *Westover v. E. River Elec. Power Coop., Inc.*, 488 N.W.2d 892, 896 (S.D. 1992). As an affirmative defense, Defendant United States has the burden of proof in establishing contributory negligence. *Johnson*, 672 N.W.2d at 481 (citing *Bauman v. Auch*, 539 N.W.2d 320, 326 (S.D. 1995)).

Plaintiff argues that any negligence by Bourassa is "slight" compared to Chief Neuenfeldt's negligence because Neuenfeldt had no jurisdiction to pursue Bourassa's vehicle outside the boundaries of the reservation and was essentially operating as a private citizen. (Doc. 56 at 937). Specifically, Plaintiff argues that Chief Neuenfeldt was operating outside the Mutual Assist

18

Agreement with Moody County because neither Chief Neuenfeldt nor the Tribe received a direct call for assistance. The Mutual Assist Agreement provides that "a proper request for the County shall be communicated directly, either formally or informally, by the Sheriff's Office or the Sheriff's designee(s), to the Tribal Chief of Police or the Chief's designee."

It appears to the Court that if Chief Neuenfeldt was operating outside the Mutual Assist Agreement, he would also be operating outside the section 638 contract and this Court would lack jurisdiction over this case because Neuenfeldt would not be considered an "employee of the Government . . . acting within the scope of his office or employment." *See* 28 U.S.C. § 1346(b)(1). Pursuant to the Annual Funding Agreement, which is incorporated by reference into the Tribe's section 638 contract, the Tribe is authorized to provide law enforcement services "for persons visiting or residing within the exterior boundaries of the Flandreau Santee Sioux Tribal Reservation." (Doc. 40-1 at 259-60). The Annual Funding Agreement acknowledges, however, that "[w]hen operating within the scope of this contract, the [Tribe] may be required to leave or operate outside of Indian country." (Doc. 40-1 at 260). The Funding Agreement lists instances in which the Tribe may be required under the section 638 contract to operate outside the boundaries of the reservation but specifies that the list is not exclusive. (Doc. 40-1 at 260) ("Such requirements may include, but are not limited to . . ."). It appears from the Government's certification of employment that it considers Neuenfeldt to be operating under the Tribe's section 638 contract when Chief Neuenfeldt was operating pursuant to the Mutual Assist Agreement with Moody County. The Government stated in its Certification of Employment that in making the certification, it relied on "the 638 contract with its relevant attachments, which include the Annual Funding Agreement and the Law Enforcement Assist Agreement between the Flandreau Santee Sioux Tribal Police and Moody County, South Dakota." (Doc. 24 at 138).

In Plaintiff's opposition brief, it is argued that "the United States has conceded that Neuenfeldt was acting as a governmental employee on June 17, 2017" by certifying that Neuenfeldt was acting within the scope of his employment during the time in question. (Doc. 57 at 947). As best as the Court can determine, it appears that Plaintiff is arguing that the Government's certification that Chief Neuenfeldt was acting pursuant to his section 638 contract conclusively establishes this fact even if the Court finds that he was acting outside the Mutual Assist Agreement with Moody County. This is not so. If the Court were to find that Chief

Neuenfeldt was not acting pursuant to the Mutual Assist Agreement and the section 638 contract, the implementing regulations to the FTCA provide "a certification under this section may be withdrawn if a further evaluation of the relevant facts of the consideration of new or additional evidence calls for such action." 28 C.F.R. § 15.4(c).

Regardless, the Court finds that Chief Neuenfeldt was operating pursuant to the Mutual Assist Agreement. The Mutual Assist Agreement provides that the request for assistance may be "formal" or "informal," but does not define these terms. Sheriff Wellman testified that as a matter of practice, a general call for backup to all available units includes the Tribe. (Doc. 41-1, Wellman Dep. 41:4-17). Plaintiff has pointed to no evidence in the record that this is not so. Statements by Nicholas Cottier, the Tribe's former Chief of Police, that he "wouldn't qualify this as a mutual aid assist, because it was 30 miles out of town and there were two Moody County officers there" do not address the issue of whether there was a "proper request" for the Tribe's assistance under the Mutual Assistance Agreement with Moody County. (Doc. 59-8, Cottier Dep. 15:18-23).

The Court now turns to its contributory negligence analysis. "Although the character of the plaintiff's contributory negligence . . . is not to be determined by comparison to the care exercised by the reasonable man as an absolute standard but must be compared to the negligence of the defendant, the norm of conduct of the ordinarily reasonable and prudent man must be considered in determining the extent to which each party fell below the standard and thus was guilty of negligence or contributory negligence." *Nugent v. Quam*, 152 N.W.2d 371, 594-95 (S.D. 1967). In a vehicle pursuit, a police officer has a common law duty to "exercise ordinary care or skill not to injure another." *Schreiner v. United States*, Civ. No. 03-5069, 2005 WL 1668429, at *3-4 (D.S.D. Jul. 18, 2005). The duty of ordinary care is that which an "ordinarily prudent or reasonable person exercises under the same or similar circumstances." *Id.* at *4 (citing *Doyen v. Lamb*, 49 N.W.2d 382, 383 (S.D. 1951); *see also Blacksmith v. United States*, Civ. No. 06-5022, 2008 WL 11506053 (D.S.D. Jan. 16, 2018) (concluding that under South Dakota law, an officer has a duty of care to a fleeing suspect). A high-speed chase under the circumstances in this case presents an objectively reasonable risk of a crash, which may cause injury to the occupants of vehicles involved in the chase. *See Holthusen v. United States*, 498 F.Supp.2d 1236, 1244 (D. Minn. 2007). A reasonable inference can be made from the record that Chief Neuenfeldt continued

20

a high-speed pursuit of Bourassa's vehicle, at night, down what he knew to be a dead-end gravel road.

However, this Court finds that the facts in the record show beyond any dispute that Bourassa was negligent more than slight compared to the negligence of Chief Neuenfeldt. This is true whether we consider comparative negligence from Chief Neuenfeldt's pursuit of Bourassa after he evaded Trooper Kurtz or his pursuit of Bourassa down 229-A. Bourassa failed to obey the officers' commands to stop, and in his attempts to elude the officers, continued to drive at excessively high speeds on gravel roads over more than a 20-minute period. The chase even went down a two track non-maintained road at one point. At another point Bourassa drove through a ditch to continue his evasion. Then, after the evasion had gone on for some time, Bourassa had an opportunity to discontinue the pursuit when he was stopped by Deputy Baldini and Chief Neuenfeldt on Highway 13 and instructed by Deputy Baldini to stop or get out of his vehicle. Instead, Bourassa reversed to turn down 229-A, and continued to drive fast[2] down this gravel road, at night, in his further attempt to elude police officers. These facts are undisputed, and the Court finds as a matter of law that no reasonably prudent person would continue to elude police officers and drive in this manner under these circumstances. *See Nugent*, 152 N.W.2d at 594-95 (stating that the norm of conduct of the ordinarily reasonable and prudent man must be considered in determining the extent to which each party fell below the standard and thus was guilty of negligence or contributory negligence). The Court finds that Bourassa failed to exercise reasonable care for his own safety by his continued efforts to elude police officers under the facts in this case. *See Id.* at 597.

The Court finds that no reasonable factfinder could conclude that Bourassa's negligence was "slight" in comparison to the negligence of Chief Neuenfeldt. There is no evidence that Chief Neuenfeldt's vehicle made contact with Bourassa's vehicle on 229-A. Rather, Bourassa's vehicle crashed while he was eluding police officers by driving fast down a dead-end gravel road at night, and he suffered serious injuries as a result. The Court concludes as a matter of law that Bourassa was contributorily negligent to the degree where he is barred from recovery.

---

[2] When asked "How fast were you guys driving down 229A? What it fast or was it 20 miles an hour?  I'm looking for fast," Roemen responded, "Yes, fast." (Doc. 41-8, Roemen Dep. at 112:1-6).

To prove assumption of risk, a defendant must show "1) that the plaintiff had actual or constructive knowledge of the specific risk involved; 2) that the plaintiff appreciated the risk's character; and 3) that the plaintiff voluntarily accepted the risk, having had the time, knowledge, and experience to make an intelligent choice." *Carpenter v. City of Belle Fourche*, 609 N.W.2d 751, 764 (S.D. 2000). "[T]he difference between assumption of risk and contributory negligence 'is frequently one between risks which were in fact known to the plaintiff, or so obvious that [the plaintiff] must be taken to have known of them, and the risks which [the plaintiff] merely might have discovered by the exercise of ordinary care." *Carpenter*, 609 N.W.2d at 764. Although assumption of risk is generally a jury question, "where the essential elements are conclusively established [ ] the plaintiff may be charged with assumption of the risk as a matter of law." *Goepfert v. Filler*, 563 N.W.2d 140, 142 (S.D. 1997) (citation omitted).

To assume the risk, one must have actual or constructive knowledge of the peril involved. *Id.* at 143. Constructive knowledge will be imputed if the risk is so plainly observable that "anyone of competent faculties [could be] charged with knowledge of it." *Id.* (quoting *Westover v. E. River Elec. Power Co-op., Inc.*, 488 N.W.2d 892, 901 (S.D. 1992)). "Risk is intrinsic to some acts." *Id.* For example, the South Dakota Supreme Court affirmed summary judgment on assumption of the risk against a plaintiff who was injured after stepping on an unstable pile of lumber while loading a garbage truck. *See Myers v. Lennox Co-op. Ass'n*, 307 N.W.2d 863 (S.D. 1981). The South Dakota Supreme Court has also held that "reasonable minds cannot differ on the jeopardy involved in stepping from a moving vehicle." *Goepert*, 563 N.W.2d at 143. As in these cases, the Court finds that it is inherently risky to, as Bourassa did in this case, try to elude police officers by engaging in a high-speed chase down gravel roads at night. The Court concludes that reasonable minds cannot differ on the jeopardy involved in engaging in such conduct.

Next, the Government must prove as a matter of law that Bourassa appreciated the danger undertaken in eluding police officers in this manner. Plaintiff argues that Bourassa was relatively young at 23 years old, that he exercised poor judgment in fleeing, and that this poor judgment demonstrates that Bourassa did not understand the risk involved. (Doc. 56 at 939). An individual will be held to have appreciated the danger undertaken if it was "a risk that no adult person of average intelligence can deny." *Id.* "One may not close his eyes to obvious dangers, and cannot recover where he was in possession of facts from which he would be legally charged with

22

appreciation of the danger." *Id.* (quoting *Herod v. Grant,* 262 So.2d 781, 783 (Miss. 1972)).  In *Goepfert v. Filler*, 563 N.W.2d 140, 143 (S.D. 1997), the South Dakota Supreme Court concluded that a twenty-two year old college student "had to know and appreciate the hazard he faced in leaping from a moving car." *Id.* This Court holds as a matter of law that eluding police officers as Bourassa did under the circumstances present in this case "was a risk that no adult person of average intelligence can deny" and Bourassa will be held to have appreciated the danger undertaken by his actions.

Finally, assumption of risk requires voluntarily acceptance, having had the time, knowledge, and experience to make an intelligent choice. *Id.* "Acceptance of risk necessarily connotes attention to reasonable alternatives." *Id.* at 144 (citing *Mack v. Kranz Farms, Inc.*, 548 N.W.2d 812, 814 (S.D. 1996)). "Acceptance is not voluntary if another's tortious conduct leaves no reasonable alternative to avert harm or to exercise or protect a right or privilege, which another has no right to deny." *Id.* Here, even if the Court were to find that Bourassa initially panicked and fled without having appreciated the risk of danger in initially eluding police officers, he certainly had the time and opportunity to appreciate the risk of his actions over the course of the more than 20-minute high-speed chase at speeds in excess of 100 miles per hour on gravel roads. Bourassa had several opportunities to discontinue the chase. First, when he was completely stopped for approximately a minute after eluding Trooper Kurtz. Second, when he was stopped on Highway 13 and Deputy Baldini got out of his vehicle and told Bourassa to stop and exit his vehicle. Instead of obeying Deputy Baldini's commands to terminate the pursuit, Bourassa backed up and continued to try to elude police officers in a high-speed chase down 229-A. The Court concludes that Bourassa elected to continue to elude police officers that evening and knowingly assumed the risk when he again sped away, this time down 229-A. *See Goepert*, 563 N.W.2d at 144.

Accordingly,

IT IS HEREBY ORDERED:

1) The Government's Motion to Dismiss (Doc. 38) is DENIED; and

2) The Government's Motion for Summary Judgment (Doc. 35) is GRANTED.

Dated this ___ day of September, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

24